Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
PRONSKE & PATEL, P.C.
2200 Ross Ave., Suite 5350
Dallas, Texas 75201
(214) 658-6500 - Telephone
(214) 658-6509 - Telecopier
Email: vdriver@pronskepatel.com
Email: cstephenson@pronskepatel.com

*Special Counsel for Opus West Corporation,*
*Opus West Construction Corporation, and*
*O.W. Commercial, Inc*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **OPUS WEST CORPORATION,** *et al.*[1]**,** | § | **CASE NO. 09-34356-HDH-11** |
| | § | |
| Debtors. | § | **JOINTLY ADMINISTERED** |
| | § | |
| **OPUS WEST CORPORATION** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **ADV. NO. _____** |
| | § | |
| **OPUS CORPORATION, a Minnesota** | § | |
| **corporation; the OPUS FOUNDATION;** | § | |
| **the GERALD RAUENHORST 1982** | § | |
| **IRREVOCABLE TRUST F/B/O** | § | |
| **GRANDCHILDREN and the GERALD** | § | |
| **RAUENHORST 1982 IRREVOCABLE** | § | |
| **TRUST F/B/O CHILDREN, and KEITH** | § | |
| **P. BEDNAROWSKI, LUZ CAMPA, and** | § | |
| **ADLER TRUST COMPANY, a South** | § | |
| **Dakota trust corporation, as Trustees** | § | |
| **thereof,** | § | |
| | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT

---

[1] The debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Opus West Corporation (1533); Opus West Construction Corporation (5917); Opus West LP (5535); Opus West Partners, Inc. (5537); and O.W. Commercial, Inc. (9134) (collectively, the "Debtors").

**TO THE HONORABLE HARLIN D. HALE**
**UNITED STATES BANKRUPTCY JUDGE:**

Opus West Corporation ("Opus West" or "Plaintiff"), debtor and debtor-in-possession in the above-referenced bankruptcy case, hereby files this its Original Complaint (the "Complaint"), against Opus Corporation ("Opus Parent"), the Opus Foundation, the Gerald Rauenhorst 1982 Irrevocable Trust F/B/O Grandchildren, the Gerald Rauenhorst 1982 Irrevocable Trust F/B/O Children, and Keith P. Bednarowski, Luz Campa, and Adler Trust Company, as Trustees thereof (collectively, the "Trust Parties") and alleges as follows:

## I. PRELIMINARY STATEMENT

1. This is an action for equitable relief and damages arising from a parent company's systematic manipulation and abuse of the debtor – its wholly owned subsidiary – for the purpose of evading legitimate contractual obligations and debts. During the three years leading up to the filing of this bankruptcy case, Opus Parent siphoned almost $150,000,000.00 of Opus West's earnings, leaving its wholly owned subsidiary undercapitalized, inadequately financed, and unable to meet its ordinary obligations as a separate business unit. Opus Parent kept Opus West in a perpetual and precarious state of financial dependency, and systematically manipulated Opus West's operations and transactions to benefit Opus Parent and its owners without regard to the interests of Opus West and its creditors. When the commercial real estate market crashed, Opus Parent reneged on its promise to provide essential funding, leaving Opus West insolvent and with no option but to default on its debts and file for bankruptcy.

2. As a result, innocent stakeholders that should and otherwise would have been paid in the ordinary course of Opus West's business will receive virtually nothing. In contrast, Opus Parent and its owners and affiliates will continue to reap the illicit benefits of hundreds of millions of dollars in cash stripped from the company prior to its bankruptcy. That result is

fundamentally unjust and inequitable. Where, as here, a parent company does not permit its subsidiary to function as a separate entity, but rather improperly uses the subsidiary to advance the interests of the parent and its affiliates, the corporate fiction will be disregarded and all persons benefitting from the abuse become accountable for the obligations incurred by the subsidiary in pursuit of the common enterprise. This Bankruptcy Court is uniquely positioned to address the Defendants' inequitable conduct and fashion a fair remedy for the resulting harm.

## II. JURISDICTION AND VENUE

3. On July 6, 2009 (the "Petition Date"), the Plaintiff filed its voluntary petition for relief under chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code") thereby initiating the above-referenced bankruptcy case (the "Bankruptcy Case") and creating its bankruptcy estate (the "Estate").

4. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Plaintiff continues to operate its business and manage its property as a debtor in possession.

5. The Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157.

6. Venue is proper in the district pursuant to 28 U.S.C. § 1408 and 1409.

7. Nationwide service of process by first-class mail postage prepaid is available pursuant to Federal Rule of Bankruptcy Procedure 7004(b) and (d).

## III. PARTIES

8. The Plaintiff is a Minnesota corporation headquartered in Phoenix, Arizona.

9. Opus Parent is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota. Opus Parent may be served via its Chief Executive Officer, Tim Becker, Lighthouse Management Group, 2091 County Road D., East Suite C100, Maplewood,

MN 55109; or upon its registered agent, Corporation Service Company, at 380 Jackson Str. #700, St. Paul, MN 55101.

10. The Opus Foundation is a citizen of Minnesota. The Opus Foundation may be served via its trustee Adler Trust Company, c/o Patricia Schaefer, 401 E. 8th Street, Ste. 250A, Sioux City Falls, SD 57103.

11. The Gerald Rauenhorst 1982 Irrevocable Trust F/B/O Grandchildren (the "Grandchildren Trust") is a citizen of Minnesota. The Grandchildren Trust may be served via its trustee Adler Trust Company, c/o Patricia Schaefer, 401 E. 8th Street, Ste. 250A, Sioux City Falls, SD 57103.

12. The Gerald Rauenhorst 1982 Irrevocable Trust F/B/O Children (the "Children's Trust) is a citizen of Minnesota. The Children's Trust may be served via its trustee Adler Trust Company, c/o Patricia Schaefer, 401 E. 8th Street, Ste. 250A, Sioux City Falls, SD 57103.

13. Keith P. Bednarowski ("Bednarowski") is a citizen of Minnesota. Bednarowski may be served at his place of residence, 700 S. 2nd Street, Unit 61, Minneapolis, MN 55401.

14. Luz Campa ("Campa") is a citizen of Minnesota. Campa may be served at his place of residence, 10760 Ginseng Lane, Hanover, MN 55341.

15. The Adler Trust Company ("Adler Trust") is a trust corporation organized and existing under the laws of the State of South Dakota with its principal place of business in Sioux Falls, South Dakota. Adler Trust may be served via its registered agent Patricia Schaefer at 401 E. 8th Street Ste. 25A, Sioux Falls, SD 57103-7034.

## IV. FACTUAL BACKGROUND

### A. Relationship Between Opus Parent and Opus West

16. Opus Parent, established in 1953, is a full-service corporation involved in office,

industrial, retail, multifamily, and institutional real-estate development. Over the years, Opus Parent's operations grew to encompass cities around the United States and Canada. Beginning in the 1980's, Opus Parent began establishing regionally based subsidiaries to provide such services to specific geographic areas (the "Subsidiaries"). The Subsidiaries include Opus East, L.L.C., Opus North Corporation, Opus Northwest, L.L.C., Opus South Corporation, Opus West Corporation, and O.R.E. Development Corp. Opus Parent's sister corporation, Opus L.L.C., owns Opus East, L.L.C. and Opus Northwest, L.L.C. The remaining Subsidiaries, including Opus West, are directly or indirectly wholly-owned by Opus Parent.

17. First established in 1979, Opus West, through its predecessors and affiliates, owned and/or developed more than 52.7 million square feet of real estate in Arizona, California, Texas, Nevada, New Mexico and Utah. Opus West's assets, as of the Petition Date, included interests in approximately fifty (50) commercial and residential real estate projects located across its territory consisting of condominium, office, industrial, apartment, and retail projects in various stages of development.

18. As Opus West's owner, Opus Parent exercised dominant control over its subsidiary's corporate functions, and operated Opus West as an insufficiently capitalized facade for Opus Parent's individual dealings. Opus Parent maintained control over Opus West in multiple ways, such as keeping a close eye on the performance and financial status of the subsidiary and dictating uses of Opus West's revenues for the benefit of Opus Parent and its owners and affiliates. For example, in December of 2005, for the purpose of allowing unfettered monitoring and access to the Subsidiaries' performance, Opus Parent implemented an enterprise resource planning software solution (the "ERP Software") produced by J.D. Edwards/Peoplesoft. The ERP Software includes several modules that monitored and integrated Opus West's real

estate, construction and accounting activities. Those activities included technology, human resources and risk management. Over time, other accounting functions functions were also centralized – resulting in accounting policies and procedures, deadlines and annual audit coordination all resting at Opus Parent. The ERP Software's implementation gave Opus Parent unfettered access to Opus West's inventory, production, and most importantly, financials. Thus, the ERP Software allowed Opus Parent to maintain full awareness of Opus West's financial position at any given time.

19. Additionally, Opus West directly supplied Opus Parent with regular financial reporting, including quarterly balance sheets, income statements and projections of income, real estate asset balances, debt balances and debt-to-equity ratios, as well as monthly cashflow projections. As Opus West's financial health deteriorated, it began generating periodic weekly cashflow projections. Together with the ERP Software access, these reports provided Opus Parent with a "dash board" view of Opus West's financial condition.

20. Opus Parent also supervised Opus West through its common board members. At least two of Opus West's board members also served on Opus Parent's board or were related to the Trustees, *i.e.*, Mark Rauenhorst and sons and Keith Bednarowski. Opus West held quarterly board meetings, providing these Opus Parent and Trust insiders a full view of all Opus West's business.

**B.** **The Distribution Scheme**

21. Another way that Opus Parent asserted control over Opus West was through the issuance of financial directives. As a wholly-owned subsidiary of Opus Parent, Opus West was at the mercy of Opus Parent and fully subject to such directives. One such directive required Opus West to contribute 1% of its pre-tax net income directly to charity, and to send 9% of its

pre-tax net income directly to Opus Parent purportedly for Opus Parent to contribute to charity. Opus Parent mandated these contributions, even when Opus West clearly could not afford to make them.

22.     Another Opus Parent directive, in effect until late 2005, required Opus West to distribute **75% of its pre-tax net income** (that remaining *after* the total 10% "charitable" contribution) to Opus Parent.  In November of 2005, Opus Parent modified this policy, requiring Opus West to distribute **35% of its pre-tax net income** plus **pro-forma taxes computed with respect to such pre-tax net income** to Opus Parent (the "Distribution Policy").  *See* November 11, 2005 Memorandum detailing the Distribution Policy attached hereto as **Exhibit "A**." Essentially, the Distribution Policy still required Opus West to distribute approximately 75% of pre-tax net income remaining after the initial 10% "charitable" contribution, while allowing Opus West to take advantage of a lower capital gains tax rate.  Opus Parent's Distribution Policy left Opus West with a paltry 22.5% of its pre-tax net income to service debt, and purchase, develop, market and sell commercial real estate and cover its operating expenses in future non-profitable years.

23.     Opus Parent enforced the Distribution Policy by requiring Opus West to declare "dividends."[2]  When Opus West declared a dividend due to Opus Parent, Opus West had to create pro-forma financials in order to estimate the amount of the dividend (the "Estimated Dividend").  Based upon these pro-forma financials, in December of each year, Opus West paid 80% of the Estimated Dividend immediately to Opus Parent.  Later, after completion of customary annual audits, Opus West paid the remaining 20% of the Estimated Dividend to Opus Parent.  The audits provided a final number in accordance with the Distribution Policy.

---

[2] Opus Parent is Opus West's sole shareholder, and as shown below, a large portion of the so-called "dividends" were made while Opus West was severely undercapitalized, insolvent, and generally unable to pay its debts as they came due.

Therefore, the 20% payment required by mid-March of each year included a "true up" to account for any shortfall or overpayment that may have been made with the estimated 80% December payment.[3]

### C. Effect of Opus Parent's Required Distributions

24.     In early 2008, as the economy began sinking further into a recession, the commercial real estate market began to crumble.  Upon information and belief, throughout 2008, commercial properties devalued by at least 30%.  This steep decline in commercial real estate values paired with stricter lending terms and a diminished buyers' market made Opus Parent's enforcement of Distribution Policy irresponsible and unethical; and Opus West's compliance with the Distribution Policy nearly impossible.

25.     Despite the undeniable effect of the market decline on Opus West's cash flow, Opus Parent continued to direct Opus West's compliance with the Distribution Policy.  Specifically, between 2006 and 2008, Opus West made the following distributions to Opus Parent per the Distribution Policy[4] (collectively the "Dividend Distributions"):

| Date of Transfer | Amount of Distribution |
|:---:|:---:|
| 12/21/06 | $53,663,000.00 |
| 3/15/07 | $7,391,000.00 |
| 12/20/07 | $48,042,000.00 |
| 3/17/08 | $12,249,000.00 |
| **Total** | **$121,345,000.00** |

26.     In addition to the Dividend Distributions, Opus West also made contributions of 9% of its pre-tax net income directly to Opus Parent ostensibly for Opus Parent to contribute such income to charitable foundations closely related to Opus Parent at the Trust Parties,

---

[3] The yearly "true up" was also performed in connection with the required charitable contributions.
[4] Distributions listed below do not include required charitable donations.

including, without limitation, the Opus Foundation. Between 2006 and 2008, Opus West made the following distributions to Opus Parent for "charitable contributions" (with the Dividend Distributions, the "Distributions"):

| Date of Transfer | Amount of Transfer |
|---|---|
| 2006 | $9,506,000.00 |
| 2007 | $15,446,000.00 |
| **Total** | **$24,952,000.00** |

27.     From the outset, Opus Parent maintained Opus West as an undercapitalized corporation, inadequately financed to meet the normal obligations foreseeable in its business. Opus Parent's systematic draining of Opus West's earnings kept the subsidiary in a continuous condition of financial dependency. From 1995 to 2007, Opus West paid Opus Parent a total of $322,183,000.00 in dividends. Through the Distribution Policy, Opus Parent ensured that Opus West remained undercapitalized and completely beholden to Opus Parent for all needed working capital. Each of the Distributions left Opus West significantly undercapitalized to operate in the cash-strapped commercial real estate market. As of the Petition Date, Opus West had a debt load of approximately ***$1.5 billion*** dollars. After making a Distribution, in order to meet the debt-to-equity covenants in its loan documents, Opus West had to request a loan from Opus Parent, which shortly thereafter had to be repaid. As a result, the Distributions left Opus West in a perpetual cycle of paying the "dividend" to Opus Parent, and then being forced to negotiate modified loan covenants, including extentions thereof, to prevent immediate acceleration and foreclosure. Beginning at the end of 2005, Opus West constantly requested extensions, and modifications to financial covenants. Beginning in 2009, such negotiations included requests to the lenders to forebear from exercising their remedies upon Opus Wests' defaults..

28.     Opus Parent's Distribution Policy created, exacerbated and sustained Opus West's crippled cash position, leaving Opus West at the mercy of Opus Parent to loan Opus West sufficient funds to survive. Opus Parent kept Opus West dependent upon these loans, needing the loans while struggling to repay them amidst Opus Parent's other financial directives. Without them, Opus West was unable to operate its business and carryout Opus Parent's directives. Insensitive to Opus West's plight, Opus Parent blithely continued its expectations of Opus West to develop, construct, market and sell real estate across Arizona, California and Texas, as well as meet its operating obligations on approximately 22.5% of its pre-tax net income.

29.     As of no later than December 31, 2005, Opus West was out of compliance with the debt-to-equity ratios required by Opus West's lenders. From March 2006 through December 2008, Opus West required and received assistance from Opus Parent in the form of loans, to maintain compliance with Opus West's loan documents. However, after each Distribution, Opus West would have to request a loan from Opus Parent in order to meet requirements under its loan documents. Opus West's constant struggle to stay afloat and financial dependency on Opus Parent from 2006 through 2008 demonstrates its severe undercapitalization.

30.     As a result of its inadequate financing, Opus West found itself unable to generally pay its debts as they came due. Specifically, if Opus West's lenders had not signed waivers for December 31, 2005 or modified compliance requirements in subsequent years and had accelerated the loans based upon Opus West's lack of compliance with debt to equity ratio requirements, Opus West would not have been able to meet its obligations. Although Opus Parent knew, as early as March 2006, the Distributions left Opus West with little or no capital with which to conduct its business, and that each Distribution left Opus West severely

undercapitalized, Opus Parent continued to require strict compliance with the Distribution Policy.

**D.     The Non-Existent Safety Blanket – Opus Parent's False Promises**

31.     Beyond the control Opus Parent exerted through its financial oversight and directives, Opus Parent also manipulated Opus West by establishing trust and a course of dealing that Opus West would come to rely upon.  As Opus West made the Distributions, which put Opus West in the position of needing loans from Opus Parent,Opus Parent continually reassured Opus West that the industry is cyclical in nature and that Opus Parent remained able and willing to assist Opus West financially when and if such assistance was needed.  "Built to last" was a common theme at officer meetings.  Such a promise of support is evidenced by a course of dealing between Opus Parent and Opus West as illustrated by Opus West's regular requests for funding and Opus Parent's provision of one capital contribution and numerous loans from 1998 through 2008.

32.     Opus West believed that Opus Parent maintained access to capital for a "rainy day fund" that would be available in the event of an economic downturn.  In fact, Opus Parent's promised "backing" of its Subsidiaries is evidenced by its contribution of roughly $60 million to Opus South Corporation ("Opus South") to bolster its real estate holdings and debt obligations and its issuance of a letter to Opus South Corporation's ("Opus South") lenders, stating their future financial support for debts owed by Opus South.   Upon information and belief, Opus Parent ceased to follow through with this promise to "make good" on Opus South's debt.  Like Opus West, Opus South also was forced to seek assistance through chapter 11 bankruptcy, United States Bankruptcy Court for the District of Delaware, Case No. 09-11390-MFW.

33.     Just like Opus Parent failed to keep its promise to Opus South, Opus Parent neglected to fulfill its repeated promises to Opus West that Opus Parent would always be there to fund requests on an as-needed basis.  Upon information and belief, Opus Parent never intended to keep those promises and continue to provide Opus West with funds once the real estate market declined.  However, Opus Parent never refused the Distributions and continued to require and accept them until Opus West found itself no longer able to give.

34.     Opus West relied on Opus Parent's promises and representations to its detriment.  Opus Parent maintained that it would financially assist Opus West when and if needed.   Opus West relied on this representation in continuing to honor the Distribution Policy.  Unfortunately, when the time came for Opus Parent to follow through with this promise, Opus Parent did what was best for Opus Parent, leaving Opus West with no choice but to declare bankruptcy.

35.     Upon information and belief, no financial institution would have continued to extend credit or do business with Opus West without Opus Parent's implicit guaranty.  Opus West's legitimate creditors also suffered damage because when Opus Parent failed to follow through with its commitments to provide financing and/or continued financial support, they were left unpaid.  Thus, Opus Parent's broken promises damaged not only Opus West, but also Opus West's lenders.

### E.      The Chino Hills Transactions

36.     In June 2008, Opus Parent took advantage of its substantial control over Opus West, this time through the manipulation of business dealings.  Opus Parent used the considerable imbalance of bargaining power between itself and Opus West to deprive Opus West of the value of its assets, more specifically, the Chino Hills Development.

37.     In 2002, one of Opus West's special purpose entities, Shoppes at Chino Hills, Inc., acquired what would come to be known as The Shoppes at Chino Hills, located in Chino Hills, California (the "Chino Hills Development").  Opened in late May 2008, the Chino Hills Development contained a newly constructed, 379,817 square foot lifestyle shopping center, located in the most affluent city in Southern California's Inland Empire: Chino Hills.  The Chino Hills Development featured over 80 retailers, anchored by Barnes & Noble, XXI Forever, H&M, and grocer Trader Joes, as well as an impressive lineup of restaurants.  Notably, Jacuzzi Brands Corporation decided to call the Chino Hills Development home for its world-wide corporate headquarters.  As of May 2008, the Chino Hills Development constituted Opus West's largest wholly-owned asset.

38.     In June of 2008, shortly after Chino Hills' opening, Opus West sold the Chino Hills Development stock to Opus Sales Corporation (the "Buyer"), a holding corporation owned 100% by Opus Parent (the "Chino Hills Sale").  This sale was instituted to assist Opus West in compling with debt covenants in loan documents.  The sale agreement required the Buyer to pay the $170,073,000.00 purchase price as follows: a 10% cash payment, and the remainder of the consideration to be paid via an unsecured note in the amount of $43,065,700.00 payable to Opus West with a 7% annual interest rate (the "Additional Note").  The Additional Note would be paid with monthly interest payments and the principal was due 80% on December 20, 2008 and 20% on March 15, 2009.  The remainder of the consideration is comprised of a loan secured by the Chino Hills Development upon which Opus West was a guarantor.  Opus West was required to remain liable on the guaranty despite the sale of the stock to the Buyer.

39.     Opus West would never have approved of a sale to a third party purchaser with the purchase price payment structured in this manner.  A very low 10% down payment, coupled

with the generous seller financed note and remaining liable on the guarantee would only have been acceptable from an investment grade purchaser. The reason Opus West would have been unwilling to make this deal with a third party purchaser is simple: risk of repayment. However, in this case, Opus Parent stood behind the Buyer. Opus West knew the amount of the large Dividend Distributions it paid to Opus Parent and, with the distributions other subsidiaries would also be paying, felt this would be more than sufficient to satisfy the payments due to the secured lender as well as under the Additional Note.

40.     Given the creative and advantageous terms of this carefully orchestrated sale, it is clear that Opus Parent took advantage of its power and authority over Opus West, convincing Opus West to sell its largest wholly-owned asset under terms that failed to meet industry standards. Unfortunately for Opus West, Opus Parent's greedy and irresponsible acts did not stop there. When the 80% principal payment of the Additional Note came due in December 2008, Opus Parent decided it was unable (or unwilling) to fund this payment. As such, Opus Parent required Opus West to accept the stock of Shoppes at Chino Hills, Inc. in exchange for cancellation of the Additional Note (the "Chino Hills Buy-back"). Because of the drastic decrease in commercial real estate values between the time of the Chino Hills Sale and the Chino Hills Buy-back, the stock was then practically worthless.

41.     This default impacted Opus West deeply. Opus West had counted upon the Buyer's payment in December 2008 to provide operating capital in a declining market. At the time the Chino Hills Development sold, it was a valuable property. However, when the Buyer returned the stock to Opus West, along with the obligations to the secured lender, the property had devalued. The stock never regained its former value and was sold for a *de minimis* amount through the Opus West bankruptcy.

42.     The aggregate effect of the Chino Hills Sale and the Chino Hills Buy-back resulted in Opus West bearing the risk of Opus Parent's purchase, depriving Opus West of the value of the Additional Note, $43,065,700.00, as well as any additional equity Opus West may have had, resulting in a total loss of approximately $45-50 million.  Furthermore, Opus Parent knew the drastic negative effect that the Chino Hills Buy-back would have on Opus West's financial position.

F.     **The 2008 Audit - $17.2 Million Over-Contributed by Opus West to Opus Parent between 2000 and 2008.**

43.     In 2009, a routine audit of Opus West's 2008 financial records (the "2008 Audit"), revealed that since 2005, as a result of cumulative audit adjustments, Opus West had over-contributed approximately $2.2 million to charity.  Additionally, the 2008 Audit made clear that since 2005, Opus West had over-distributed approximately $15 million as dividends to Opus Parent.  Opus West contributed all such amounts in compliance with the Distribution Policy; however, the audit company reviewed the Chino Hills Sale and other 2008 transactions and, upon such review, determined that they could not be characterized as a sales, resulting in the reduction of available net income from which to pay Opus Parent a dividend.  In addition, the audit company reviewed other transactions dating back to 2005, and such review determined that certain other transactions previously characterized as sales should be re-characterized as non-sale transactions, requiring restatements of revenue, which ultimately would have reduced the dividends owed by Opus West to Opus Parent from 2005 through 2008.

44.     Upon review of the 2008 Audit, Opus Parent conveniently refused to acknowledge its improper receipt of approximately $17.2 million (the "Excess Dividends") from Opus West.  More importantly, even after it became aware of the payment of the Excess Dividends, Opus Parent refused to return such funds, to the ultimate detriment of Opus West.

### G. Management Contract Acquisition

45.     Opus Parent's abusive manipulation of Opus West's business dealings is also exemplified by Opus Parent's seizure of Opus West's property management business. Prior to 2008, many of the Subsidiaries had their own management companies (collectively, the "Subsidiary Management Companies") that entered into and fulfilled profitable management contracts with Opus properties and third party clients (the "Management Contracts"). It was not enough for Opus Parent that it would receive its "share" of these profits through the Distribution Policy; Opus Parent wanted all of the management business.

46.     Upon information and belief, in October of 2008, Opus Parent created its own wholly-owned subsidiary, Opus Property Services, L.L.C. ("OPS") for the sole purpose of usurping the Management Contracts and all the value of each of the Subsidiary Management Companies.

47.     Pursuant to a Memorandum dated April 13, 2009, Opus Parent directed that on April 30, 2009, OPS would acquire each of the remaining Subsidiary Management Companies (Opus South Management Corporation had ended its business in early April 2009, and so was not included in the transfer), including Opus West Management Corp. *See* Memorandum describing the acquisition attached hereto as **Exhibit "B."** Under this arrangement, OPS acquired the assets and limited liabilities of the Subsidiary Management Companies, including existing Management Contracts with Opus properties and third party clients, for little or no consideration. A substantial portion of the Management Contracts acquired by Opus Parent belonged to Opus West. Though Opus West was later paid a nominal amount for certain fixed assets taken by OPS (information technology equipment, vehicles and furniture), Opus West

Management Corp. was forced to pay OPS for employee PTO balances that had accrued prior to the transfer, and, upon information and belief, OPS did not assume responsibility for certain bonuses that were due to employees, so such bonuses remained the obligations of Opus West Management Corp.

48.     Opus Parent devised this transfer scheme ostensibly to serve the best interest of the clients and the Subsidiary Management Companies.  However, once Opus Parent had its hands on the management business, it then sold OPS, along with the Management Contracts, to Northmarq for a substantial profit, yet again benefitting at the expense of Opus West and depriving Opus West of the value of its asset.

**H.     The Trust Parties - the Ultimate Beneficiaries**

49.     Upon information and belief, the Trust Parties are the sole stockholders of Opus Parent.  At the order of the Trust Parties, Opus Parent made regular distributions of assets to the Trust Parties and the Opus Foundation.

50.     Upon information and belief, after receiving the Distributions, Opus Parent transferred the Distributions, or the value of the Distributions, directly to the Trust Parties and the Opus Foundation.

51.     Thus, the Trust Parties and the Opus Foundation, along with Opus Parent, directly benefitted from Opus Parents acts to unfairly deprive Opus West of the value of its assets.

**V.     CAUSES OF ACTION**

**Count One**
**(Constructive Fraudulent Transfer as to Present and Future Creditors)**
**Tex. Bus. & Comm. Code § 24.005(a)(2)**

52.     Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

53. Opus West made each of the Distributions to Opus Parent without receiving reasonably equivalent value in exchange for the Distributions. In fact, Opus West never received any value in exchange for any of the Distributions.

54. Each of the Distributions occurred while Opus West was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or a transaction to be conducted. Specifically, the Distributions left Opus West unable to meet the debt-to-equity covenants in its loans with its lenders without further assistance from Opus Parent. Further, the Distributions left Opus West with only approximately 22.5% of its pre-tax net income to purchase, develop, market, and sell commercial real estate in a collapsing market and cover its operations in future non-profitable years.

55. Through implementation of the ERP Software, as well as the submission of all financial reporting described herein, Opus Parent had actual knowledge that each of the Distributions left Opus West with an insufficient amount of capital to operate its business.

56. Thus, Opus West seeks avoidance of the Distributions pursuant to Article 24.001 *et seq.* of the Texas Business and Commerce Code, as incorporated through section 544(b) of the Bankruptcy Code.

## Count Two
## Constructive Fraudulent Transfer
## 11 U.S.C. § 548(a)(1)(B)

57. Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

58. Within two years of the Petition Date, Opus West made each of the Distributions to Opus Parent without receiving reasonably equivalent value in exchange for the Distributions. In fact, Opus West never received any value in exchange for any of the Distributions.

59. The Distributions occurred while Opus West was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or a transaction to be conducted. For example, the Distributions left Opus West unable to meet the debt-to-equity covenants as set forth in its loans without assistance in the form of loans from Opus Parent. Further, the Distribution left Opus West with only approximately 22.5% of its pre-tax net income to purchase, develop, market, and sell commercial real estate in a collapsing market and cover its operations in future non-profitable years.

60. Because of the ERP Software and the historical and projected financial reporting, Opus Parent had actual knowledge that each of the Distributions left Opus West severely undercapitalized.

61. Thus, Opus West, as a debtor-in-possession, seeks avoidance of Opus Distributions pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

**Count Three**
**Turnover of Property**
**11 U.S.C § 550(a)**

62. Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

63. Upon information and belief that after receiving each of the Distributions, Opus Parent transferred them to the Trust Parties and the Opus Foundation, the Trust Parties and the Opus Foundation are the initial transferees of the Distributions from Opus Parent.

64. As outlined above, the Distributions are avoidable pursuant to section 548 of the Bankruptcy Code.

65. Thus, Opus West, as a debtor-in-possession, seeks recovery of the Distributions or the value of the Distributions from Opus Parent, the Opus Foundation, the Trust Parties, or any

other entity not named that may be an immediate or subsequent transferee of the Trust Parties, for the benefit of the estate.

**Count Four**
**<u>Fraud</u>**

66.     Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

67.     Opus Parent made representations to Opus West that it was prepared to assist Opus West if and when it needed assistance.  These representations were material because they were, upon information and belief, the bases on which Opus West's lenders continued to lend money to Opus West.

68.     In fact, Opus Parent never intended to continue to assist Opus West during the market decline.  Nonetheless, Opus Parent continued to make the representations in order to manipulate Opus West and continue the flow of the Distributions, depriving Opus West of its assets.

69.     Opus West relied upon these material representations to its detriment.  Such reliance was justifiable given the existence of and course of dealing established by Opus Parent's past equity contributions.

70.     Opus West relied on these representations, and ultimately was harmed by such reliance because Opus West continued to make the Distributions to Opus Parent despite the crippling effects the Distributions had on Opus West's financial position.

71.     Thus, Opus West seeks actual damages in the amount of the Distributions, exemplary damages, plus interests, costs and fees, including attorneys' fees.

## Count Five
## Conversion

72.     Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

73.     Opus West has the right to a refund of $17.2 million in Excess Dividends the 2008 Audit shows as overpaid to Opus Parent from 2005-2008.  Upon information and belief, Opus Parent reviewed the 2008 Audit and knew that it had received the Excess Dividends.  Upon such knowledge, Opus Parent recklessly and wantonly refused to return the Excess Dividends.

74.     The Excess Dividends are personal property of Opus West that it is rightfully entitled to.

75.     Upon information and belief, Opus Parent, or the Trust Parties, continued to wrongfully exercise control over the Excess Dividends by refusing to refund to Opus West the Excess Dividends.

76.     As a result of Opus Parent's theft of the Excess Dividends, Opus West was deprived of the use of those funds which ultimately contributed to Opus West's bankruptcy filing.  Further, Opus West was deprived of the value of those funds, which caused Opus West to default on the debt-to-equity covenants as set forth in its loans.

77.      Thus, Opus West seeks actual damages in the amount of $17.2 million dollars, the amount of the Excess Dividends, exemplary damages, interests, costs and fees, including attorney's fees.

78.     Additionally, Opus West seeks a constructive trust be imposed on the $17.2 million of Excess Dividends that Opus West over-contributed to Opus Parent because it is identifiable, Opus Parent's representations constituted actual fraud, and Opus Parent was unjustly enriched in the amount of $17.2 million.

## Count Six
## Fraud

79.     Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

80.     On or about June 26, 2008, Opus Parent had its holding company, Opus Sales Corporation execute the Additional Note as part of the Chino Hills Sale. During that time, Opus Parent also represented to Opus West that the Chino Hills Development was worth $170,073,000.00, the purchase price. These representations were material because they were the bases for the Chino Hills Sale. However, after the values of commercial property dropped in 2008, Opus Parent required Opus West to accept practically worthless stock in exchange for cancellation of the Additional Note, depriving Opus West of its right to payment of $43,065,700.00 under the Additional Note.

81.     Upon information and belief, Opus Parent was aware at the time of the Chino Hill Sale that the country was experiencing and/or would be experiencing a severe downturn in the real estate market. Thus, at the time of the Chino Hills Sale, Opus Parent intentionally misrepresented its intentions regarding the Chino Hills Sale. Furthermore, Opus Parent made the representations as to value of the Chino Hills Development and the Chino Hills sale, knowing they were false. Alternatively, Opus Parent made such representations recklessly, as a positive assertion, without first doing the due diligence to determine the validity of its representations.

82.     Upon information and belief, Opus Parent made the representations with the intent that Opus West rely on the representations, and Opus West ultimately relied on the representations and sold the Chino Hills Development in accordance with the terms of the Chino Hills Sale.

83.     Opus Parent's actions in directing that its holding company not follow through with the terms of the Chino Hills Sale injured Opus West because it prevented Opus West from receiving the benefit of the Chino Hills Sale

84.     Thus, Opus West seeks actual damages in the amount of $43,065,700.00, the amount of the Additional Note, exemplary damages, plus interests, costs and fees, including attorney's fees.

**Count Seven**
**Constructive Fraudulent Transfer as to Present and Future Creditors**
**Tex. Bus. & Comm. Code § 24.005(a)(2)**

85.     Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

86.     Opus West transferred the stock in connection with the Chino Hills Development to Opus Sales Corporation without receiving reasonably equivalent value in exchange. Specifically, Opus Parent encouraged Opus West to accept the Additional Note as partial payment for the Chino Hills Sale.   However, at the time of the Chino Hills Sale, upon information and belief, Opus Parent did not intend to allow its holding company to pay the Additional Note.

87.     The Chino Hills Buy-back occurred while Opus West was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or a transaction to be conducted.   Specifically, the Chino Hills Buy-back caused Opus West to default on its loans with its lenders by breaching the debt-to-equity covenants. Additionally, because of the Distributions, Opus West was already left with only approximately 22.5%   of   its   pre-tax   net   income   to   develop,   and   market   a   real   estate   construction   and

development company in a collapsing real estate market and cover its operations in future non-profitable years.

88.    Because of the ERP Software and the periodic financial reporting provided by Opus West, Opus Parent had actual knowledge that the Chino Hills Buy-back left Opus West severely undercapitalized.

89.    Moreover, the ERP Software and the financials showed that after the Chino Hills Buy-back, the sum of Opus West's debts was greater than all of its assets.

90.    Opus Parent knew or reasonably should have known that at the time of the Chino Hills Buy-back, Opus West would be generally unable to pay its debts as they came due.

91.    Thus, Opus West seeks avoidance of the Chino Hills Buy-back pursuant to Article 24.001 *et seq.* of the Texas Business and Commerce Code, as incorporated by section 544(b) of the Bankruptcy Code.

**Count Eight**
**Constructive Fraudulent Transfer**
**11 U.S.C. § 548(a)(1)(B)**

92.    Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

93.    Within two years of the Petition Date, Opus West transferred to Opus Sales Corporation stock in connection with the Chino Hills Development without receiving reasonably equivalent value in exchange.  Specifically, Opus Parent encouraged Opus West to accept the Additional Note as partial payment for the Chino Hills Sale.  However, at the time of the Chino Hills Sale, upon information and belief, Opus Parent did not intend to allow its holding company to pay the Additional Note.

94.     The Chino Hills Buy-back occurred while Opus West was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or a transaction to be conducted.  The Chino Hills Buy-back caused Opus West to default on its loans with its lenders because it caused them to breach their debt-to-equity covenants in its loans.  Additionally, because of the Distributions, Opus West was already left with only 22.5% of its pre-tax net income to develop and market a real estate construction and development company in a collapsing real estate market and cover its operations in future non-profitable years.

95.     Opus Parent's access to Opus West's financial data via the ERP Software is further evidence that Opus Parent had actual knowledge that the Chino Hills Buy-back left Opus West severely undercapitalized.

96.

97.     Thus, Opus West, as a debtor-in-possession, seeks avoidance of the Chino Hills Buy-back pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

**Count Nine**
**Turnover**
**<u>11 U.S.C. § 550(a)</u>**

98.     Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

99.     On or about June 26, 2008, Opus Parent's wholly owned holding company, Opus Sales Corporation, executed the Additional Note as part of the Chino Hills Sale.  However, after the values of commercial property dropped in 2008, Opus Parent required Opus West to accept practically worthless stock in exchange for cancellation of the Additional Note, depriving Opus West of its right to payment of $43,065,700.00 under the Additional Note.  Thus, Opus West was

fraudulently deprived of $43,065,700.00.

100.    As outlined above, the Chino Hills Buy-back is avoidable pursuant to section 548 of the Bankruptcy Code.

101.    Thus, Opus West, as a debtor-in-possession, seeks recovery, for the benefit of the estate, of $43,065,700.00, the difference in value that it was deprived of, from Opus Parent, the Trust Parties, or any other entity not named that may be an immediate or subsequent transferee of the Trust Parties.

### Count Ten
### Tortious Interference with Contract

102.    Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

103.    In 2008, Opus West Management Corp., a wholly-owned subsidiary of Opus West, was a party to numerous Management Contracts for properties Opus West developed as well as third party properties.

104.    In April 30, 2009, Opus Parent intentionally interfered in those Management Contracts by forcing Opus West Management Corp. to transfer all of its management contracts to OPS.

105.    Opus Parent's directives and intermeddling were the direct and proximate cause of Opus West's actual damages.

106.    Opus West suffered actual damages because it was deprived of the value of the Management Contracts.

107.    Thus, Opus West seeks actual damages in the amount of the Management Contracts, exemplary damages, plus interest, costs and fees, including attorney's fees.

108.    Additionally, Opus West seeks a constructive trust be imposed on the value of the Management Contracts because the amount is traceable, and Opus Parent was unjustly enriched.

### Count Eleven
### Constructive Fraudulent Transfer as to Present and Future Creditors
### Tex. Bus. & Comm. Code § 24.005(a)(2)

109.    Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

110.    Opus Parent directed Opus West and Opus West Management Corp. to transfer the Management Contracts to OPS without receiving reasonably equivalent value, in exchange.

111.    The transfer of the Management Contracts occurred while Opus West was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or a transaction to be conducted.  Specifically, the transfer of the Management Contracts constituted a transfer of one of Opus West's only income-producing assets.  Additionally, because of the Distributions, Opus West was already left with only approximately 22.5% of its pre-tax net income to develop and market a real estate construction and development company in a collapsing real estate market and cover its operations in future non-profitable years.

112.    Due to Opus Parent's access to Opus West's financial data via the ERP Software, and through the provision of periodic financial reporting, Opus Corp had actual knowledge that the transfer of the Management Contracts stripped Opus West of a much needed income producing asset without which Opus West was left severely undercapitalized.

113.    Thus, Opus West seeks avoidance of the transfer of Management Contracts pursuant to Article 24.001 *et seq.* of the Texas Business and Commerce Code, as incorporated by section 544(b) of the Bankruptcy Code.

## Count Twelve
## Constructive Fraudulent Transfer
## 11 U.S.C. § 548(a)(1)(B)

114.    Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

115.    Within two years of the Petition Date, Opus Parent directed that Opus West Management Corp. transfer the Management Contracts to OPS without receiving reasonably equivalent value in exchange.

116.    The transfer of the Management Contracts occurred while Opus West was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or a transaction to be conducted.  Specifically, the transfer of the Management Contracts stripped Opus West of one of its only income-producing assets.  Further, because of the Distributions Opus West was already left with only approximately 22.5% of its pre-tax net income to develop and market a real estate construction and development company in a collapsing real estate market and cover its operations in future non-profitable years.

117.    Opus Parent had actual knowledge that the transfer of the Management Contracts stripped Opus West of a much needed income-producing asset, without which it was left severely undercapitalized.

118.    Thus, Opus West, as a debtor-in-possession, seeks avoidance of the transfer of the Management Contracts pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

## Count Thirteen
## Turnover
## 11 U.S.C. § 550(a)

119.    Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

120.    At the time of the transfer of the Management Contracts, the Management Contracts had a substantial value.  Thus, Opus West was fraudulently deprived of such value.

121.    As outlined above, the transfer of the Management Contracts to OPS is avoidable pursuant to section 548 of the Bankruptcy Code.

122.    Thus, Opus West, as a debtor-in-possession, seeks recovery, for the benefit of the estate, the value of the Management Contracts when they were transferred to OPS, from OPS, Opus Parent, the Trust Parties, or any other entity not named that may be an immediate or mediate transferee of the Trust Parties.

### Count Fourteen
### Piercing the Corporate Veil

123.    Opus West hereby incorporates by reference the foregoing paragraphs of this Complaint.

124.    The corporate form should be disregarded against Opus Parent and/or the Trust Parties because, as set forth in full herein, 1) the corporation was organized and operated as a mere tool or business conduit of another; 2) the form was used as a sham to perpetrate a fraud; 3) the form was used to evade an existing legal obligation; 3) the form was used to circumvent a statute; 4) the corporation was inadequately capitalized so as to work an injustice; 5) Opus Parent and/or the Trust Parties caused the corporation to be used for the purpose of perpetrating an actual fraud; and/or 6) Opus Parent and/or the Trust Parties perpetrated an actual fraud on Opus West primarily for Opus Parent and/or the Trust Parties' direct personal benefit.

### Count Fifteen
### Negligent Misrepresentation

125.    Opus West incorporates by reference the foregoing paragraphs of this Complaint.

126.    By its wrongful conduct described above, Opus Parent made false representations to Opus West in the course of its business and in a transaction in which it had a pecuniary interest.   Opus Parent failed to exercise reasonable care or competence in obtaining and communicating those representations to Opus West.   Opus West justifiably relied on those representations and, as a direct and proximate result, suffered actual damages in the amount of the Distributions, plus exemplary damages, interest, costs and fees, including attorneys' fees.

### Count Sixteen
### Promissory Estoppel

127.    Opus West incorporates by reference the foregoing paragraphs of this Complaint.

128.    By its wrongful conduct described above, Opus Parent made promises to Opus West.   Opus West reasonably and substantially relied on those promises to its detriment, and such reliance was foreseeable by Opus Parent.   Opus Parent did not fulfill its promises, and injustice can be avoided only by enforcing them.   As a direct and proximate result of Opus Parent's conduct, Opus West suffered actual damages in the amount of the Distributions, plus exemplary damages, interest, costs and fees, including attorneys' fees.

### Count Seventeen
### Conspiracy

129.    Opus West incorporates by reference the foregoing paragraphs of this Complaint.

130.    Defendants acted in concert with one another and one or more unknown persons to engage in the wrongful conduct and accomplish the unlawful purposes described above. Defendants and their co-conspirators agreed on the object and course of action to be accomplished and perpetrated vert, unlawful acts in furtherance of the conspiracy.   As a direct and proximate result, Opus West suffered actual damages in the amount of the Distributions, plus exemplary damages, interest, costs and fees, including attorneys' fees.s described below.   Each

Defendant acted in concert to cause those damages, benefitted from the wrongful conduct described herein and, therefore, is jointly and severally liable to Opus West.

### Count Eighteen
### Accounting

131.     Opus West incorporates by reference the foregoing paragraphs of this Complaint.

132.     Opus West seeks an accounting pursuant to 11 U.S.C. 542(e) and/or the common law of the transactions described above including, but not limited to, Defendants' use and/or disposition of the Distributions or any proceeds; the Chino Hills transactions; the acquisition of the Management Contracts; and the financial benefits or effect of those transactions on Opus Parent and its owners and affiliates.

### Count Nineteen
### Constructive Trust and Disgorgement

133.     By their wrongful conduct described above, Defendants have been unjustly enriched at Opus West's expense and detriment.  Opus West requests that a constructive trust be placed in its favor on all funds or tangible or intangible assets of Opus West in Defendants' possession, custody or control, any proceeds from such funds or assets, and/or any and all profits realized by Defendants as a direct or indirect result of those funds or assets.  Opus West further seeks disgorgement of any such profits or assets in an amount sufficient to compensate it for the harm suffered as a result of Defendants' wrongful conduct.

## VI.     RESERVATION OF RIGHTS

134.     Opus West reserves all of its rights to seek such other and further relief against Opus Parent and the Trust Parties as may be appropriate, including, but not limited to, recovery of a money judgment, issuance of a restraining order or other relief.

# VII.   PRAYER

WHEREFORE PREMISES CONSIDERED, Opus West requests that Opus Parent and the Trust Parties be cited to appear and answer this Complaint and that upon trial of this Complaint, Opus West be awarded judgment as follows:

(a)     avoidance of each of the Distributions as fraudulent transfers pursuant to Article 24.001 *et seq.* of the Texas Business and Commerce Code; and/or

(b)     avoidance of each of the Distributions as fraudulent transfers pursuant to section 548 of the Bankruptcy Code;

(c)     recovery of the Distributions from Opus Parent and/or the Trust Parties pursuant to section 550 of the Bankruptcy Code;

(d)     avoidance of the Chino Hills Buy-back as a fraudulent transfer pursuant to Article 24.001 *et seq.* of the Texas Business and Commerce Code; and/or

(e)     avoidance of the Chino Hills Buy-back as a fraudulent transfer pursuant to section 548 of the Bankruptcy Code;

(f)     recovery from Opus Parent and/or the Trust Parties pursuant to section 550 of the bankruptcy Code;

(g)     avoidance of the transfer of the Management Contracts to Opus Management Corporation pursuant to Article 24.001 *et seq.* of the Texas Business and Commerce Code; and/or

(h)     avoidance of the transfer of the Management Contracts to OPS pursuant to section 548 of the Bankruptcy Code;

(i)     recovery of the Management Contracts from OPS pursuant to section 550 of the Bankruptcy Code.

(j)     imposition of a constructive trust and equitable lien on the $17.2 million over-contributed to Opus Parent;

(k)     actual damages;

(l)     exemplary damages;

(m)     any costs and fees, including attorney's fees, incurred in bringing this action and such other relief as the Court may deem proper.

Dated: January 25, 2010                     Respectfully submitted,

                                            /s/ Vickie L. Driver
                                            Vickie L. Driver
                                            State Bar No. 24026886
                                            Christina W. Stephenson
                                            State Bar No. 24049535
                                            PRONSKE & PATEL, P.C.
                                            2200 Ross Ave., Suite 5350
                                            Dallas, Texas 75201
                                            (214) 658-6500 - Telephone
                                            (214) 658-6509 - Telecopier
                                            Email: vdriver@pronskepatel.com
                                            Email: cstephenson@pronskepatel.com

                                            *Special Counsel for Opus West Corporation,*
                                            *Opus West Construction Corporation, and*
                                            *O.W. Commercial, Inc.*